**UNITED STATES of America, Plaintiff,**

v.

**Endia ALLEN, Defendant.**

**Crim. A. No. 6–80421.**

United States District Court,
E. D. Michigan, S. D.

Nov. 5, 1976.

Philip Van Dam, U. S. Atty., Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Jerald N. Aaron, Barbara, Ruby, Domol, Bowerman, Miller & Aaron, P. C., Detroit, Mich., for defendant.

### MEMORANDUM OPINION REGARDING MOTION TO SUPPRESS

FEIKENS, District Judge.

Endia Allen is presently under indictment for the possession of heroin with intent to distribute, 21 U.S.C. 841(a)(1). She has brought this motion to suppress as evidence

a quantity of heroin seized by federal drug agents at the time of her arrest. The material facts were stipulated by counsel at hearing on the motion.

On March 21, 1976 at approximately 10:14 a. m., Special Agent Paul Markonni routinely watched the arrival of American Airlines Flight No. 242 at the Detroit Metropolitan Airport from Dallas/Ft. Worth, Texas. American Airlines Flight No. 242 is a connecting flight from many west coast cities including Los Angeles and San Diego, California. Special Agent Markonni observed a Negro female (later identified as defendant Endia Allen) deplane and observed that she appeared unusually nervous and was glancing about the arrival Satellite as she walked to the American Airlines Baggage Claim area. There, she made what appeared to be a local telephone call and then waited nervously for her baggage to arrive from the flight. Allen, who continued to glance about in the Baggage Claim area, subsequently claimed a brown folding wardrobe and walked out of the terminal toward a waiting taxi.

At approximately 10:20 a. m., Special Agent Markonni approached Allen outside the south terminal, identified himself, and requested that Allen produce identification. Allen stated that she had no identification and handed her airline ticket, issued in the name Ms. D. Johnson, Michigan, to Special Agent Markonni. Allen's hand was visibly shaking. Special Agent Markonni again asked for anything in her possession that would identify her, and she again replied that she had no identification and stated "my name is Donna Johnson." Allen stated that she was from Detroit and had come back to get her daughter. She indicated she would be returning to Los Angeles that day. Allen's suitcase bore the name John Jordan, which is familiar to Special Agent Markonni and which was different than the name under which she was flying. Jordan is a documented large-scale heroin dealer. Special Agent Markonni suggested that Allen accompany him to a private office to avoid any unnecessary embarrassment to her and Allen complied. As they walked,

Allen again stated that she was coming to Detroit to pick up her daughter and that she would be returning to Los Angeles later that day.

In the first aid office of the south terminal, Special Agent Markonni advised defendant that he believed her to be in possession of a quantity of narcotics and verbally advised her of her constitutional rights, as reflected on DEA Form 132. Special Agent Markonni further advised defendant Allen that she had the right to allow or refuse to allow a consent search of her wardrobe and person and asked defendant if she would consent to allow Special Agent Markonni to search her wardrobe. Allen became visibly shaken and extremely nervous and began shouting incoherently. She indicated she did not have a key to the suitcase and did not want her suitcase opened. She stated that her mother had packed the suitcase and that she had forgotten to get the key. Special Agent Markonni, personally convinced that defendant was in possession of a quantity of narcotics, arrested Allen for violation of the Federal Controlled Substance Act. Allen was then escorted to the Detroit Metropolitan Airport DEA Office, where the wardrobe bag was forcibly opened in her presence, and a quantity of suspected heroin, approximately 1044.3 grams, was found inside.

Defendant concedes that her initial confrontation with Agent Markonni outside the airport terminal was only an investigative stop and that Agent Markonni acted upon a reasonable suspicion in making this brief detention. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1971). Defendant contends, however, that Agent Markonni did not have probable cause to arrest her subsequently in the airport first aid room, and for this reason, she argues that the heroin seized incident to her arrest must be suppressed. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; *U. S. v. Townsend,* 394 F.Supp. 736 (E.D.Mich.1975). It was to this issue of probable cause that the testimony

and argument at the suppression hearing was directed.

Agent Markonni testified that he is a member of a special unit of the DEA assigned to investigate and intercept persons transporting drugs into the Detroit area through Metropolitan Airport. In the two years since he was assigned to this detail, his unit has come to rely heavily on visual observation of suspects in making tentative identifications. As an aid in this work, the DEA has compiled a list of characteristics which it believes are common denominators of drug traffickers. Known as the "courier profile," this set of characteristics was gathered from the records of cases investigated to date by special agents at Metropolitan Airport and is used by the agents as a prototype in singling out suspected traffickers for further investigation. Agent Markonni testified that this method of identifying drug couriers has, in his experience, been highly successful,[1] and the government has made an *in camera* presentation to the court to establish its reliability. The characteristics comprising this profile include: flying under an assumed name, arriving from a city known to be a major drug center—notably, Los Angeles, San Diego, and Dallas/Ft. Worth, paying for a plane ticket with small currency, travelling with little or no baggage, using a false telephone number to make airline reservations, placing a telephone call immediately after deplaning, meeting known drug dealers, and acting in an unusually nervous or agitated manner.

Agent Markonni testified that defendant Allen's behavior matched the courier profile in several respects and that his initial decision to approach and question her was made on this basis. His suspicions were first aroused by the unusually nervous and covert behavior of defendant as she entered the airport arrival station and proceeded to the Baggage Claim area. Agent Markonni also noted that defendant had arrived from Dallas/Ft. Worth on a flight that may have originated in Los Angeles or San Diego and that she placed an apparently local phone call almost immediately upon landing.

This investigative technique has been the subject of a recent decision in this District, *United States v. Van Lewis*, 409 F.Supp. 535 (1976), in which Judge Joiner upheld the validity of the courier profile as a basis for making an investigative stop of a suspected individual but ruled that further evidence of drug possession was needed to establish probable cause for arrest.

> Unless agents have more indicia of criminal activity than that indicated by their observation of the profile factors made public in the record, probable cause will be lacking. Additional information about a given suspect is necessary. This need not be much; perhaps not as much as might be required to sustain an arrest or search where one of the ingredients of probable cause is an informant's tip, something, in other words, which singles out a suspect from the innocent traveling population.

*U. S. v. Van Lewis, supra,* p. 543.

Both parties here agree with this authority and argue that it should control this case. Defendant contends that her behavior and statements throughout this episode were "inherently innocent" and did not sufficiently distinguish her from the average

---

1. Agent Markonni estimated that of the approximately 175 arrests which he has made at Metropolitan Airport to date, more than two-thirds of them were based on the courier profile. Of the searches, both consensual and nonconsensual, conducted in these cases, more than 90% turned up drugs. More specific figures on the performance of this special unit are related in *United States v. Van Lewis,* 409 F.Supp. 535, 539 (1976):

   > Since initiation of the DEA airport detail, agents have searched 141 persons in 96 airport encounters prompted by the use of the courier profile and independent police work. Some encounters led to more than one search. Agents found controlled substances in 77 of the 96 encounters and arrested 122 persons for violations of the narcotics laws. Of the 77 searches in which illegal drugs were found, the agents identified 26 consent searches. Forty-three searches were nonconsensual. Illegal contraband was seized in all cases in which consent was not given and a search was made. In 15 to 25 consent searches, agents did not uncover any contraband drugs.

airline passenger to justify her arrest. This contention is not supported by the stipulated facts.

When first approached by Agent Markonni, defendant produced her airline ticket as identification, and the name on this ticket, D. Johnson, was different than the name of John Jordan which Agent Markonni observed on defendant's suitcase. As the defendant points out, this discrepancy is not conclusive evidence that she was travelling under an alias, since she could have borrowed the suitcase from Jordan and apparently did. Nevertheless, Agent Markonni testified that, in his experience, it is uncommon for persons travelling by plane to have someone else's name on their luggage. More unusual still was the fact that, aside from her ticket, defendant had absolutely no other way of identifying herself.

The name of John Jordan found on defendant's wardrobe was significant to Agent Markonni for another reason. Jordan, according to the stipulated facts, is a "documented large-scale heroin dealer," and Markonni was aware of this at the time he arrested defendant. At the evidentiary hearing, Agent Markonni related that he had been informed of Jordan's criminal activities by other DEA agents and from written reports in an active drug investigation ongoing at the time. Among other things, these reports reflected grand jury testimony on Jordan's drug dealing. Defendant points out that all of this information was hearsay to Agent Markonni and that Jordan had not been convicted or even arrested for these reported crimes at the time his name was observed on her suitcase. These factors, however, do not sufficiently undercut the reliability of these sources, and past cases have sanctioned the use of

such information in establishing probable cause. *Adams v. Williams, supra*;[2] *Glick v. Erikson,* 356 F.Supp. 535, 538 (S.D.1973), aff'd, 488 F.2d 182 (1973).

There were also several inculpatory statements made by the defendant to Agent Markonni prior to her arrest. As they proceeded to the first aid room, defendant twice volunteered that she had arrived from Los Angeles to pick up her daughter and was returning to Los Angeles that same day. Agent Markonni testified that such an itinerary was peculiar in itself and appeared inconsistent with the fact that defendant was carrying luggage. When asked if she would consent to a search of her wardrobe bag, defendant stated that it was locked and that the key had been left in Los Angeles due to the oversight of her mother. This statement lacks plausibility.

Finally, Agent Markonni was able to observe an increasing state of nervousness in the defendant as his investigation proceeded. When defendant first presented her airline ticket, her hand was shaking visibly. When defendant was subsequently asked for permission to search her suitcase, she became extremely nervous and began shouting incoherently. Defendant argues, with some merit, that her nervousness was not an unusual response in this situation and that anyone who had just deplaned from a long flight would show some agitation at being accosted and interrogated by a plainclothes narcotics agent. But defendant here was more than just upset; she was, according to Agent Markonni's testimony, "hysterical." Even discounting defendant's behavior for the stressful situation in which she found herself, her actions, in Markonni's opinion, revealed a conscious-

---

**2.** "[W]e reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response." *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612, 617–618.

ness of wrongdoing which belied her facially exculpatory responses to his questions.

Agent Markonni has been a police officer for ten years, and during the almost two years that he worked as a narcotics agent at Metropolitan Airport, he has participated in the arrest of some 150–175 drug suspects. While the court is always wary of placing too much reliance on the prescience of an arresting officer in determining whether probable cause is made out, the court believes that, in this case, Agent Markonni's assertion that he is able to distinguish innocent nervous behavior from the allegedly more agitated and distraught behavior of a drug courier is entitled to some weight.[3]

On the basis of all of these factors, the court finds that Agent Markonni had probable cause to arrest defendant Allen. Though no single factor would have been incriminating enough to validate this arrest, the court believes that the totality of the circumstances presented to Agent Markonni provided sufficient corroboration for his suspicions and singled the defendant out from the common crowd of airport traffic as a probable drug courier.

Defendant places much reliance on that portion of *U. S. v. Van Lewis, supra,* in which Judge Joiner ruled that defendant Paula Hughes had been illegally arrested by narcotics agents using the same courier profile procedure involved here. That case is readily distinguishable. At the time Hughes was arrested, DEA agents knew only that she had travelled from Los Angeles under an alias, appeared nervous upon deplaning, and looked somewhat like a person who had been convicted of heroin possession a short time before. This last characteristic was patently spurious as an indication of criminality, and the remaining two factors were properly ruled insufficient to constitute probable cause. This case presents a significantly more complete and persuasive set of incriminating evidence, including defendant's lack of adequate identi-

fication, her peculiar itinerary, her implausible responses to Agent Markonni's questions, her apparent connection with a documented large-scale heroin dealer, and her hysterical behavior upon being asked permission to search her suitcase. These circumstances, in the court's opinion, establish probable cause.

Accordingly, defendant's motion to suppress is denied. An appropriate order may be submitted.

---

**3.** See *Terry v. Ohio,* 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, 907, where the Court noted the arresting officer's "30 years' experience in the detection of thievery from stores in the same neighborhood" in approving his decision to further investigate a suspected store robbery.